# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

### AT BRIDGEPORT

FILED
2004 MAY 14 P 5:03
US DISTRICT COURT
BRIDGEPORT

| | |
|---|---|
| **HADLEY MACPHERSON (EGAN)** | **NO.  3:02CV1309  SRU** |
| and | |
| **RACHEL EGAN** | **MAY 14, 2004** |
| and | |
| **LOYAL EGAN** | |
| PLAINTIFFS | **CIVIL ACTION** |
| **VS.** | |
| **ATTORNEY JOHN BERMAN** | |
| and | AMENDED |
| **BERMAN, BOURNS & CURRIE, LLC** | **COMPLAINT** |
| and | |
| **BERMAN, BOURNS, AARON & DEMBO, LLC** | |
| and | |
| **PAUL EGAN** | **JURY DEMANDED** |
| DEFENDANTS | |

**Allegation of Diversity Jurisdiction**

1.      The plaintiff alleges the following to the best of her belief and knowledge:

2.      The plaintiff claims diversity jurisdiction under 28 U.S.C. 1332, and alleges:

3.      The plaintiff, Hadley Macpherson, (Lisa Egan), is a citizen of the state of Pennsylvania.

4.      The plaintiff, Hadley Macpherson, (Lisa Egan),  resides at 3710 Hancock Lane, Doylestown, Pennsylvania, and receives her mail at P.O. Box 501, Lahaska, Pennsylvania, 18931.

5.      This suit was filed in the previous legal name of "Lisa Egan" along with "Hadley Macpherson", as the plaintiff, though historically known as "Hadley", carried the given first name of "Lisa" until 1999, at which time, following her divorce, she legally dropped the un-used "Lisa" along with the married name of "Egan".

6..      The plaintiff, Rachel Egan, is a citizen of the state of Pennsylvania.

7.      The plaintiff, Rachel Egan resides at 3710 Hancock Lane, Doylestown, Pennsylvania, and receives her mail at P.O. Box 501, Lahaska, Pennsylvania, 18931.

8.      The plaintiff, Loyal Egan, is a citizen of the state of Pennsylvania.

9.      The plaintiff, Loyal Egan, resides at 3710 Hancock Lane, Doylestown, Pennsylvania, and receives his mail at P.O. Box 501, Lahaska, Pennsylvania, 18931. following her 1999 divorce.

10.      The defendant, Attorney John Berman, is a citizen of the state of Connecticut.

11.      The defendant, Attorney John Berman, resides in West Hartford Connecticut, and is a citizen of Connecticut.

1

12.    The defendant, Berman, Bourns, & Currie LLC  is a citizen of the state of Connecticut.

13.    The defendant, Berman, Bourns, Aaron, and Dembo LLC is a citizen of the state of Connecticut.

14.    The defendant, law firm, Berman, Bourns, & Currie LLC, during the time of the events in question, became Berman, Bourns, Aaron & Dembo LLC.

15.    The defendant, Berman, Bourns, & Currie LLC, and the defendnt, Berman, Bourns, Aaron, and Dembo, LLC is a law firm that operates its main business out of its law offices located at 900 Farmington Avenue, West Hartford, Connecticut.

16.    The defendant, Paul Egan, is a citizen of the state of Connecticut.

17.    The defendant, Paul Egan, resides at 44 Kendall Avenue, New Haven, Connecticut, and receives his mail at P.O. Box 83, Centerbrook, Connecticut, 06409.

18.    The amount the plaintiff seeks to recover in damages is over $75,000.

Jay Abrahmson, and Pastor Conrad Koch, and the church counselor, Karen Wenthe, all of whom

were counseling the defendant, Paul Egan, and spoke to them on several occasions regarding the

history of domestic violence, telling them she could not be any more submissive or obedient

unless to her own physical and emotional detriment, and asked them repeatedly to aid her in

stopping the defendant, Paul Egan, from his abuse of her, and to convince him to seek outside

help in the Non-Violence Alliance Program, a therapy program for abusers.

27.    Pastor Jay Abrahmson, and Pastor Conrad Koch promised they would aid the

plaintiff if she would not go to the police, but continued to tell her that her lack of obedience to

the defendant, Paul Egan, and lack of submission to him, was the root cause of his violent

behavior, and that she needed to submit to his authority over her in order to have relief.

28.    Throughout October 1997, and November 1997, the defendant, Paul Egan, came

to the family home, and committed further acts of violence against the plaintiff, Lisa Egan, and

the plaintiff repeatedly went to the pastors to ask them to get him into the Non-Violence Alliance

Program, which was met with continued admonition not to go to the police.

29.    In late November 1997, the plaintiff, Lisa Egan, phoned the Avon Police

Department, telling them that she feared for her and her children's welfare because the

defendant, Paul Egan, had gone over to the family home in anger, and taken the shotgun when

the plaintiff, Lisa Egan, was not at home, the child Rachel Egan, then 12, having seen him take it.

30.    The plaintiff, Lisa Egan, told the Avon Police that she feared the defendant, Paul

Egan, would be back to use the gun on her, the children, or on himself, and asked them to

confiscate the shotgun to prevent any crime from occurring.

31.    The Avon Police Department told the plaintiff there was nothing they could do

since the shotgun was passed down to the defendant, Paul Egan, through the family, and though

unlicensed, was therefore untouchable, unless or until it was used to commit a violent crime.

32.     In early December 1997, elder David Avezzi and Cynthia Aveezzi, went and spoke to both Pastor Conrad Koch, and Pastor Jay Abramson, and informed them that Paul Egan had personally confessed to them to habitually beating and smothering the plaintiff, Lisa Egan, and that they feared that the defendant would use the shotgun on the family, asking the pastors to intervene, to which they were told to stay out of things.

33..     On February 14, 1998, the defendant, Paul Egan, committed another violent act against the plaintiff, Lisa Egan, and the child plaintiff, Rachel Egan, made a physical attempt to stop the defendant, Paul Egan, from harming the plaintiff, all witnessed by Loyal Egan

34.     Immediately following the violent event, that same day, the plaintiff Lisa Egan, phoned the church, spoke directly to Pastor Conrad Koch, and took the children to the Valley Community Baptist Church, where the children each separately met with the Conrad Koch, as well as did the plaintiff, Lisa Egan, and as well as did the defendant, Paul Egan later that same day.

35.     The plaintiff, Lisa Egan, once again, asked Pastor Conrad Koch to convince the defendant, Paul Egan to enter the Non-Violence Alliance Program, or she would have to take police action to protect herself and the children, as she was extremely frightened for the family's safety, to which Pastor Koch once again told her not to contact the police.

36.     In early March of 1998, due to the recent violent event of February 14, 1998, and continued fear of the defendant, Paul Egan's, possession of the shotgun, the plaintiff, Lisa Egan, went to the Avon Police Department to file a criminal complaint of Assault and Battery, against the defendant, Paul Egan.

37.     Officer Whitton was the officer who took the plaintiff, Lisa Egan's statement, and

upon hearing that the defendant had committed habitual acts violence against the plaintiff throughout the marriage, immediately advised the plaintiff that she needed to file for Restraining Orders in Superior Court at Hartford..

38.     Officer Whitton questioned the plaintiff, Lisa Egan, as to why she had not done so already, stating her lack of protective action made the allegations suspect...

39.     The plaintiff, Lisa Egan, then told Officer Whitton, that Paul Egan, had confessed to his violent acts to at least six people who could verify the allegations she was making, including the two pastors of her church who were also fully aware and had been confessed to by the defendant, Paul Egan..

40.     When Officer Whitton, asked the plaintiff, why she had waited to file the Complaint, the plaintiff, Lisa Egan, told Officer Whitton, that the pastor's at her church, Valley Community Baptist Church, located in Avon, had repeatedly told her to hold off from taking any police action, that they would get the defendant, Paul Egan into a program if she were patient.

41.     Officer Whitton, then however expressed shock, and disclosed that he himself had a personal and religious connection with Pastor Jay Abramson, and could not believe that Pastor Abramson would not have mandatorily reported the domestic violence due to the presence of young children in the home, and went on to explain the Mandatory Reporter statutes to the plaintiff, and the obligations of specific individuals under them.

42.     Officer Whitton, disclosed that he himself was an elder of his   church located down the street from Valley Community Baptist Church, also evangelical. .

43.     Officer Whitton then instructed the plaintiff, Lisa Egan to go home and wait for him to present her Complaint to the Prosecutor to see if the prosecutor would arrest the defendant, Paul Egan, given the lapse in time from the latest incident.

44.    While the plaintiff, Lisa Egan, however, was still in the Avon Police Department interview room, another police officer, Officer Jadovich, an elder at Valley Community Baptist Church, came on shift, and seeing the plaintiff in the interview room, later called Officer Whitton at his home that evening wanting to know why the plaintiff was at the police station, and what for, to which Officer Whitton disclosed to him the reason.

45.    Officer Whitton then called the plaintiff, Lisa Egan, at her home the next day, and told her of the phone conversation between he and Officer Jadovich the night before, and that Officer Jadovich, stated his own disbelief in the allegations.

46.    Two days later, Officer Whitton, phoned the plaintiff, Lisa Egan, and asked her if she had filed for a Restraining Order yet, to which the plaintiff said she had obtained the form and was in the process of typing her statement to the Court.

47.    Officer Whitton then told the plaintiff not to file for her Restraining Order, but to contact Pastor Jay Abramson instead, instructing her at least three times to "Call Jay".

48.    When the plaintiff, Lisa Egan, asked what had happened to the criminal Complaint she had made, Officer Whitton told the plaintiff, that he never gave it to the Prosecutor as he knew the prosecutor would not issue an arrest.

49.    Officer Whitton continued to try to convince the plaintiff to refrain from filing for Restraining Orders, to which the plaintiff stated that she would not speak to the pastors any more about the issue, and that she was going to take action to protect her and her children..

50.    Several days later, the Avon Police Department contacted the Department of Children and Family Services, and sent them to investigate the Egan home as to the safety of the situation with regards to the two children, Rachel Egan and Loyal Egan.

51.    On or about April 4, 1998, Kimberly Innis, an investigator for the Department of

7

Children and Family Services showed up unannounced at the Egan home, and entered to immediately investigate, and interview the two children, Rachel Egan and Loyal Egan, who were both home at the time.

52.   On April 6, 1998, the Department of Children and Family Services determined that the allegations of "physical and emotional abuse and neglect of the children" had been "substantiated" against the defendant, Paul Egan.

53.   The Department of Children and Family Services immediately ordered the plaintiff, Lisa Egan, to obtain and maintain Restraining Orders against the defendant, Paul Egan, on behalf of herself and her children, preventing the defendant, Paul Egan, from going to the family home, or going near the children, until measures could be taken to ensure their safety..

54.   The Department of Children and Family Services informed the plaintiff, Lisa Egan, that if she failed to seek the Restraining Orders, and allowed the defendant, Paul Egan, to come into the family home, or see his two children, Rachel Egan and Loyal Egan, the children would be immediately removed from the plaintiff's custody, and the plaintiff, Lisa Egan, herself would be charged with Child Endangerment, Abuse, and Neglect..

55.   The plaintiff, Lisa Egan, filed for a Restraining Order against the defendant, Paul Egan, on behalf of her and her two minor children, plaintiffs Rachel Egan and Loyal Egan, then aged 13 and 8.

56..   The plaintiff, Rachel Egan, filed for her own personal Restraining Order against her father, the defendant, Paul Egan.

57.   On April 7 , 1998, the defendant, Paul Egan, appeared without an attorney, at the Hartford Superior Courthouse, located at 95 Washington Street, in Hartford, to answer the allegations of abuse at a Hearing on the Restraining Orders.

58.     After meeting with a Family Relations officer, Laura Furniss, for over an hour, and reading the 32 page document of domestic violence allegations going back to the beginning of the marriage, the defendant, Paul Egan, admitted to the allegations in the Restraining Order document, and did not contest the plaintiff, Lisa Egan's application for protection, or Rachel Egan's application for protection, but agreed to the terms of the Civil Restraining Orders.

59.     The Family Relations officer, Laura Furniss, in the presence of the defendant, Paul Egan, then advised the plaintiff, Lisa Egan, to file for divorce, pro se if necessary due to her lack of any money or assets of her own.

60.     The Honorable Judge Anne Dranginis, in Courtroom 300, then granted the Restraining Orders of both the plaintiff, Lisa Egan, for her and her two children, as well as the separate Restraining Order of Rachel Egan, then 13 years old, for herself alone.

61.     The Honorable Judge Anne Dranginis further ordered that the defendant, Paul Egan, be denied any access to the children for a period of six months, and ordered him to seek psychiatric/psychological treatment outside and apart from the church counselor he was presently seeing, as well as to continue to provide monetarily for the his wife and children during the sixth month period.

62.     Less than two weeks later, on  April 14, 1998, the defendant, Paul Egan, was arrested at Valley Community Baptist Church, for violating his Restraining Orders.

63.     The defendant, Attorney John Berman,  who was then the attorney for the Valley Community Baptist Church, was recommended to the defendant, Paul Egan, by the pastor, Jay Abramson.

64.     The defendant, Paul Egan, then professionally engaged the defendant, Attorney John Berman, to legally represent him in both Criminal and Family court.

65      On May 18, 1998, the plaintiff, Lisa Egan, filed for Divorce, pro se.

66.     On May 26, 1998, the defendant, Paul Egan, appeared for the first time with his attorney, the defendant, Attorney John Berman, in Family Court, at the Superior Court at 95 Washington Street, at Hartford, Connecticut.

67.     From his first appearance at that Contempt Hearing for Violation of Restraining Orders, on May 26, 1998, until his final appearance at a Hearing October 31, 2001, the defendant, Attorney John Berman represented the defendant, Paul Egan, in all Family Court and Criminal Court proceedings.

68.     The defendant, Attorney John Berman, represented the defendant, Paul Egan, for all Pendente Lite Motions, for all litigation at the Divorce Trial itself, and for all Post-Judgment Motions, until December 5, 2001.

69.     On January 26, 1999, upon Motion of the defendant, Attorney John Berman, and the defendant, the Court agreed to court appoint a Guardian or Attorney for the Minor Children, to represent the interests of the child plaintiffs, Rachel Egan and Loyal Egan, during the upcoming Divorce Trial scheduled for April 26, 1999.

70.     On February 3, 1999, the court appointed Attorney Sally Hodgdon to represent the child plaintiff's Rachel Egan, and Loyal Egan, in the capacity of Attorney for the Minor Children..

71.     Attorney Sally Hodgdon was not released from her court appointment until May 29, 2002.

72.     The defendant, Attorney John Berman, throughout the course of his representation of the defendant, Paul Egan, was completely aware that the defendant, Paul Egan, had committed multiple acts of violence against his wife, the plaintiff, Lisa Egan, throughout their marriage.

73   The defendant, Attorney John Berman, throughout the course of his representation of the defendant, PE., was completely aware that the defendant, P.E., had Committed acts of emotional abuse against his wife, the plaintiff, LE, throughout their marriage.

74   The defendant, Attorney John Berman also had specific knowledge of those acts of physical and emotional abuse, from his being present to hear the judicial admissions made by his client, the defendant, Paul Egan, during the Divorce Trial.

75   The defendant, Attorney John Berman, had knowledge of those violent acts, and acts of emotional abuse, from the information contained in the uncontested Civil Restraining Orders issued and filed in Family Court, the violation of which he was hired to defend the defendant, Paul Egan, in Criminal Court, in the year prior to the Divorce Trial.

76   The defendant, Attorney John Berman , was aware that the defendant, Paul E, history of physical and emotional abuse had caused the Court to Order the defendant, Paul Egan, into a program for domestic violence offenders, as well as into therapy, as a result of the effect of physical and emotional abuse on his two children, Rachel Egan, and Loyal Egan.

77.   The defendant Attorney John Berman was completely aware that the Department. of Children and Family Services, and both the Criminal and Family Courts believed that the defendant, was an emotional and physical danger to his family.

78..   However during course of his representation of the defendant, Paul Egan,  the defendant, Attorney John Berman, committed numerous intentional tortuous acts against the plaintiff, Lisa Egan, and the child  plaintiffs, Rachel Egan and Loyal Egan, acts designed to knowingly put their physical and  emotional welfare at risk

79..   During his representation of his client, the defendant, Paul Egan, the defendant, Attorney John Berman, committed numerous intentional tortuous acts against the plaintiff, Lisa

11

Egan, and the child plaintiffs, Rachel Egan and Loyal Egan, acts designed to knowingly violate the laws and rules set up to protect domestic violence victims and their children..

80.     During his representation of his client, the defendant Paul Egan, the defendant, Attorney John Berman, committed numerous intentional tortuous acts against the plaintiff, Lisa Egan, and the child plaintiffs, Rachel Egan and Loyal Egan, acts designed to knowingly violate the laws and rules set up to protect every citizens Due Process Procedural and Substantive Rights.

81.     The defendant, Paul Egan, himself, with the help of his attorney, the defendant, Attorney John Berman committed numerous intentional tortuous acts against the plaintiff, Lisa Egan, and the child plaintiffs, Rachel Egan, and Loyal Egan, acts designed to knowingly violate the laws and rules set up to protect domestic violence victims and their children.

82.     The defendant, Attorney John Berman, during that same time period, in the course of representing his client, the defendant, Paul Egan, committed numerous intentional tortuous acts against the plaintiff, Lisa Egan, and the child plaintiffs, Rachel and Loyal Egan, in an effort to financially impoverish the plaintiffs, and knowingly violate the Connecticut statutes and Child Support laws, and Connecticut Court rules and regulations designed to ensure that no robber of children, and their legal entitlements, takes place in the context or as a result of Divorce.

83.     The defendant, Attorney John Berman, was at all times aware that when he was deliberately committing those intentional tortuous acts, that he was violating the Statutes, Child Support laws, and Connecticut court rules designed to ensure that children of divorce are not robbed of their legal entitlements.

84..     The defendant, Attorney John Berman, was at all times aware that when he was committing those intentional tortuius acts, he was violating those statutes, court rules and

regulations designed to ensure that no robbery takes place of marital party as to division of marital assets and income, or the apportionment and granting of Alimony..

85.    The defendant, Paul Egan, himself, during that same time period, with the help of his attorney, the defendant, Attorney John Berman, committed numerous intentional tortuous acts against the plaintiff, Lisa Egan, and the child plaintiffs, Rachel and Loyal Egan, in an effort and with the design to financially impoverish the plaintiff, Lisa Egan, and the child plaintiffs, Rachel Egan and Loyal Egan.

86.    The defendant, Attorney John Berman, at all times relevant to his committing the intentional tortuous acts complained of in this Compliant, was a partner of the law firm to which he was employed, the law firm known as the defendant, Berman, Bourns, and Currie LLC, and later known as Berman, Bourns, Aaron, and Dembo, LLC.

88.    The defendant, Attorney John Berman, when he commited the intentional tortuous acts complained of in this Complaint, was at all times acting in the scope of his employment

89..    The defendant, Attorney John Berman, committed those intentional tortuous acts against the plaintiff, Lisa Egan, and the child plaintiff's Rachel Egan, and Loyal Egan, for the benefit of his client, the defendant, Paul Egan.

90.    The defendant, Attorney John Berman, committed those intentional tortuous acts against the plaintiff, Lisa Egan, and the child plaintiff's Rachel Egan, and Loyal Egan, for the benefit of himself and his law firm, the defendant, Berman, Bourns, & Courrie, LLC, and the defendant, Berman, Bourns, Aaron, & Dembo, LLC.

91.    The defendant, Attorney John Berman, as an attorney and judge, had complete, superior, and special knowledge and understanding of the law, and of the wrongful advantage he was taking from his position of power over the lives, freedoms, and rights of the plaintiffs, Lisa

Egan, Rachel Egan and Loyal Egan.

92.    The defendant, Attorney John Berman, in the course of his representation of the defendant, Paul Egan, knowingly and wrongfully took that advantage over the plaintiffs, without the legal authority, priveledge, or consent entitling him to do so

93.    The defendant, Paul Egan, knowingly and wrongfully took that advantage with the help of his attorney, defendant, Attorney John Berman, without the legal authority, privaledge, or consent entitling him to do so.

94.    The defendant, Attorney John Berman, had full and complete knowledge, and was at all times aware and could completely foresee to a substantial degree of certainty, the damage that would result from the intentional tortuous acts he was committing against the plaintiff, Lisa Egan, and child plaintiffs, Rachel Egan and Loyal Egan, acts alleged in the Counts of this Complaint.

95.    Thee defendant, Paul Egan, had full and complete knowledge, and was at all times aware and could completely foresee to a substantial degree of certainty, the damage that would result form the intentional tortuius acts he was committing with the help of his attorney, the defendant, Attorney John Berman, against the plaintiff Lisa Egan, and against his children, child plaintiffs, Rachel Egan and Loyal.Egan.

96.    The defendant, Attorney John Berman, as an experienced attorney, and lead partner of his firm, had full and complete knowledge, and superior knowledge, of the State and Federal Statutes, and Superior Court rules and regulations he was violating when he committed the intentional tortuous acts against the plaintiffs, alleged in the Counts of this Complaint.

97.    The defendant, Attorney John Berman as an experience attorney, lead partner of his firm, probate judge, had full and complete knowledge, and superior knowledge of his legal

14

and professional duty to abide by those laws, rules and regulations.

98..    The defendant, Attorney John Berman, as an experienced attorney, and lead partner of his firm, had full and complete knowledge, and superior knowledge, that when he was committing the intentional tortuous actsagainst the plaintiff, Lisa Egan, and child plaintiffs, Rachel Egan and Loyal Egan, he was violating the Attorney Code of Ethics.

99..    At all times, the defendant, Attorney John Berman, had superior knowledge of the law, financial resources, and legal power to continually harm the plaintiff, and the plaintiff was at all times helpless to stop or avoid that harm, as she was bound to the jurisdiction of the State of Connecticut, and bound by the defendant, Paul Egan's parental rights which gave him access to litigate against her, in the state of Connecticut, and thus continue to employ the services of the defendant, Attorney John Berman to harm the plaintiffs further, and without restraint.

100.    The plaintiff, Lisa Egan , a pro se, was at all times unable to prevent the defendant, Attorney John Berman, from committing tortuous acts against her and her children, plaintiffs, Rachel Egan and Loyal Egan, as they were legally unable to extricate themselves from dealings with the him since he was the attorney of record for the defendant, Paul Egan, during that the entire time from May 1998 through November 2001.

101.    The plaintiff, Lisa Egan, a pro se, could not legally refuse contact with the defendant, Attorney John Berman, in or out of the Superior Courthouse, as the defendant, Attorney John Berman's free will and legal right to represent the defendant, Paul Egan, and the defendant, Paul Egan's will and legal right to freely choose his own attorney,  overcame the plaintiffs' will to free herself and her children from more contact and eventual tortuous harm.

102.    The plaintiff, Lisa Egan, a pro se, was at all times unable to prevent the defendant, Paul Egan, from committing tortuous acts against her and the child plaintiffs, Rachel Egan and

Loyal Egan, as the defendant, Paul Egan, had parental rights under the laws of the state of Connecticut, which allowed him to force contact with the plaintiff, Lisa Egan, through his attorney, the defendant, Attorney John Berman, both in and out of Superior Court, at his own will, overcoming the plaintiffs will to free themselves from more contact and eventual tortuous harm.

103.   The plaintiff, Lisa Egan, a pro se, was continually advised and warned by the children's court appointed attorney, Attorney Sally Hodgdon, to in no way take any legal action against the defendant, Attorney John Berman, or report the defendant, Attorney John Berman to the Grievence Board, as long as the litigation was ongoing, or else the plaintiff, Lisa Egan would suffer the consequence of looking bad to the judges of the Superior Court Family Division, lose her credibility, and be in danger of losing her custody, her alimony, appropriate Child Support, and losing all post judgment issues, as long as the defendant, Attorney John Berman was the attorney of record for the defendant, Paul Egan

104.   The plaintiff, Lisa Egan, was unable to seek protection from the Avon Police Department, and protect her family from the defendant, Attorney John Berman's actions, as officers on the Avon Police Force were elders and members at the Valley Community Baptist Church, where the defendant, Attorney John Berman was the church's attorney, and under the authority of Pastor James Abramson, and Pastor Conrad Koch.

105   Further, the Avon Police Department had already on another occasion months later during the pending Divorce, failed to arrest the defendant, Paul Egan, for a violation of his Criminal Protective Orders against the plaintiff, and when the warrant needing to be signed by the Prosecutor of West Hartford (the town next door having jurisdiction), was ignored, the plaintiff was quietly told that defendant, John Berman was the Probate Judge of West Hartford,

and warned that she was out of her league, and should give up because some people were more powerful than they appeared, that the defendant, Attorney John Berman, had been a State Representative, and had too many friends in high places.

106.    Until December of 2001, when the plaintiff, Lisa Egan, and the child plaintiffs, Rachel Egan and Loyal Egan, learned that the defendant, Attorney John Berman had been discharged by the defendant, Paul Egan, and the plaintiffs no longer lived in the State of Connecticut, could the plaintiffs seek remedy for the tortuous acts committed against them by the defendant, Attorney John Berman, and the defendant, Paul Egan, without fearing and anticipating further infliction of harm, threat, and damage to their persons, rights, entitlements, assets, safety, and peace of mind.

107.    The intentional tortuous acts committed by the defendant, Attorney John Berman, against the plaintiff, Lisa Egan, and child plaintiff, Rachel Egan and Loyal Egan, committed for the benefit of his client, the defendant, Paul Egan, himself, and his law firm, Berman, Bourns, & Currie, and later known as Berman, Bourns, Aaron & Dembo, are averred in items 108 through    , and incorporated into all further Counts of this Complaint, Counts One through        as,      well as items averred as items 1 though 106.

109     The plaintiffs incorporate items 1 - 106 into this Count of this Complaint, and further allege:

110.    The defendant, Attorney John Berman, in the summer of 1998, used methods of coercion, extortion, and threats, in a series of letters he sent to the plaintiff, Lisa Egan, in an attempt to force the plaintiff to allow his client, the defendant, Paul Egan, to have illegal visitation with his son, child plaintiff, Loyal Egan, then 8 years old.

111.    The defendant, Attorney John Berman, in the summer of 1998, used methods of

coercion, extortion, and threats, in a series of letters he sent to the plaintiff, Lisa Egan, in an attempt to force the plaintiff to relinquish her procedural rights with regards to the Divorce, and specifically the Case Management Form, Hearing, and Scheduling.

112.    The defendant, Attorney John Berman, when the plaintiff, Lisa Egan,  would not agree to the terms demanded by the letters sent to her, threatened to withhold the support money that he had been sending her if she continued to refuse to allow for the visitation, and continued to refuse to relinquish he procedural rights.

113    When the plaintiff would not bend on either issue, the defendant, Attorney John Berman, sent the plaintiff a letter stating that he was reducing her funds as a result of her refusal to comply with his demands.

114.    The letters were sent by the defendant, Attorney John Berman, on his firms letterhead, while at the same time, the defendant, Paul Egan, was entering the Family Violence Education Program under the terms of a Family Violence Protective Order, issued by  the Criminal Court, in exchange for no jail, and his criminal record being wiped free in one year.

115.    The terms of the Family Violence Protective Order, were that the defendant, Paul Egan, have absolutely no contact at all with the plaintiff, Lisa Egan, or his children, child plaintiffs, Rachel Egan and Loyal Egan, until the disposition of the criminal case in one year, and until the defendant, Paul Egan,  and that he complete the court ordered Non-Violence therapy program which would take six months.

116.    Any violation of the terms was stated directly on the Family Violence Protective Order, to be a Criminal Violation..

117.    At the same point in time, there was a standing Criminal Protective Order, standing Civil Restraining Orders, and a mandate from the Department of Children and Family

Services that there be absolutely no contact between the defendant, Paul Egan and his children, Rachel Egan, and Loyal Egan..

118.   The defendant, Attorney John Berman, as the defendant, Paul Egan's Attorney, had full and complete knowledge of the existence of the Family Violence Protective Order, the Criminal Protective Order, the two Civil Restraining Orders, and the mandate from the Department of Children and Family Services, and completely understood from a professional point of view that any visitation between the defendant, Paul Egan, and his children, plaintiffs, Rachel Egan and Loyal Egan, would be absolutely illegal and in direct violation of all the Court Orders averred, Orders issued to ensure the safety of the children, as well as their mother, who had already been victims of habitual violence, and who were entitled to the relief granted. them.

119   The defendant, Paul Egan, having been a party to the Criminal Court Agreement, the Civil Restraining Orders, the Criminal Protective Orders, and the Department of Children and Family mandates, had full and complete knowledge that any visitation or contact was illegal, and that to make contact or force contact would be in violation of the statutes listed on the documents he had in his possession telling him so..

120   The defendant, Attorney John Berman, and the defendant, Paul Egan, when committing that coercion and extortion through the letters written and sent to the plaintiff, Lisa Egan, in the summer of 1998, intentionally withheld funds from the plaintiff, Lisa Egan, when she refused to comply with their demands for the illegal visitation, funds they knew were necessary for the feeding and housing of the two child plaintiffs, Rachel Egan, and Loyal Egan,

121   The funds were the only money coming into the household as the plaintiff, Lisa Egan, was unemployed, had been a stay at home mom for the length of the marriage, and at that time was completely uneducated and unskilled.

122     The defendant, Attorney John Berman, and defendant, Paul Egan, admitted in the letters that their purpose in withholding the support funds, was punitive retaliation for the plaintiff, Lisa Egan, refusing to allow the visitation to occur.

123     The defendant, Attorney John Berman facilitated his client, in the commission of a crime by committing coercive acts against the plaintiff, in an effort to for her to allow into allowing illegal visitation.

124     The defendant, Attorney John Berman, facilitated his client, the defendant, Paul Egan, in the commission of a crime by committing coercive acts against the plaintiff, in an effort to force her to relinquish her due process procedural rights.

125     The defendant, Attorney John Berman facilitation of the coercion by his sending of the letters , was also done to further facilitate the commission of another crime, that being the violation of the statutes known as C.G.S. 53a-110b and 53a-107 regarding Civil Restraining and Criminal Protective Orders.

126     The defendant, Attorney John Berman, and the defendant, Paul Egan conspired to deprive plaintiffs from enjoying the protection and safety entitled to them under the Fourteenth Amendment of the Constitution and the Connecticut Constitution, Art. 1 Sec. 8..

127     The defendant, Attorney John Berman, and the defendant, Pual Egan, conspired to deprive the plaintiff enjoying her due process procedural rights in the divorce action also.

128     The defendant, Attorney John Berman attempted to facilitate his client, in the commission of a crime, which is not only violation of the Attorney Code of Ethics, but is in itself a criminal offence, and the subsequent extortion, and coercion committed, criminal offenses also.

129     The plaintiff, Lisa Egan, first became involved with defendant, Attorney ohn Berman, after the defendant, Paul Egan, was arrested on April 28, 1998 for violation of the Civil

Restraining Orders # 103523 and #103524 issued against him by the Superior Court at ..

130    The defendant, Attorney John Berman sent a letter to the plaintiff, dated May 4, 1998, advising them that he was now representing the defendant, Paul Egan.

131    The defendant, Attorney John Berman was aware that the  no contact rule stated on the Restraining Orders, as it was for the violation of that rule that the defendant, Paul Egan, had been arrested.

132    The defendant, Attorney John Berman, in his letter dated May 4, 9998, being aware of the no contact terms of the Restraining  Orders, asked the plaintiff, Lisa Egan, to send all of Paul's mail to his office, since Paul's attempt to obtain documents was part of the contact violation.

133.    On May 7, 1998, the plaintiff, Lisa Egan, having no job, and no assets in her name by which to borrow against to hire an attorney,  entered her appearance as a pro se, and filed for divorce.

134    On May 11, 1998, the defendant, Paul Egan, with the aid of the defendant, Attorney John Berman, appeared in Criminal Court at G.A. in West Hartford Connecticut for the April 28, 1998 arrest for violating the Civil Restraining Orders.

135.    That same day of May 11, 1998, Criminal Protective Orders, known as Family Violence Protective Orders,  were issued to the plaintiff and the child pl.

136.    The terms and conditions of the Criminal Protective Orders were typed on its face, and were as follows:

> The Court having considered the report and recommendation fo the local intervention unit hereby orders:
> .    That the defendant refrain from imposing ay restraint upon the person or liberty o the victim.
> .    That the defendant refrain from threatening, harassing, assaulting, molesting or

sexually assaulting the victim.

The defendant refrain from entering the family dwelling or the dwelling occupied by the victim.

And the Court further Orders:  No Contact to include children Rachel (12/14/84 and Loyal (12/19/89)

137.    The Criminal Protective Order also stated:

This protective Order is made a condition of the bail or release of the defendant and, in accordance with C.G. S. 53a-110b, any violation of this order constitutes criminal violation of a protective order.  Addiditonally, in accordance with C.G. S. 53a-107, entering or remaining in a building or any othter premises in vioatin of this order constitutes criminal trespass in the first degree.  These are criminal offenses each punishable by a term of improisonment of not more than one year, a fine of not more than two thousand dollards, or both.  Vilation of this Order also violates a condition of your bail or release, and may result in raising the amount of bail or revoking release.

.        This protective order is to remain in effect until final disposition of the criminal case or until further order of the Court.

138.    A box regarding Other Orders in Effect stated the following instruction:

"x" here if a Restrainign Order, Relief from Abuse, is in effect affecting any party connected with this action.

139.    The box was checked in acknowledgment of the existence of other Civil

Restraining Orders which were still standing in Family Court, having been issued on April 7,

1998, which barred all contact between the defen. PE. And the plaintiffs for a period of six

months, to remain in full effect until October 7, 1998.

140.    On May 12, 1998, the plaintiff, Lisa Egan,  Filed a Contempt Motion in Family

Court against the defendant, P.E. for his violation of the Civil Restraining Orders back on April

12 and 14, of 1998, and for which his arrest had followed.

141.    On May 26, 1998, the plaintiff, Lisa Egan and the defendant, Attorney John

Berman, and his client, the defendant, Paul Egan, appeared before the Hon. Judge Thomas

Bishop at the Superior Court at 95 Washington street in Hartford Connecticut to litigate that

Contempt Motion..

142.    The Civil Restraining Orders, # 103523 belonging to child pla. RE, and # 103524

belong to plaintiff LE and which also explicitly covered both Re and Le, stated the following

terms:

> Refrain from imposing any restraint upon the person or liberty of any applicant
> Refrain from threatening, harassing, assaulting or molesting, sexually assaulting
> or attacking this applicant.
> Refrain from entering the family dwelling or the dwelling of the applicant.
> The Restrianing Order further stated:
> That custody of the minor children be granted to the applicant
> That the relief ordered was extended to the child plaintiffs, RE and LE
> That the defend. Ws to stay 100 feet away from the applicants.
> That the defendant, PE. Was to have no contact with the children for six months.

143.    The instruction box labelled: "Without visitation rights to the respondent"

was also checked.

144.    The Hon. Judge Thomas Bishop, after looking over the Restraining Orders stated

the following to the defendant, Attorney John Berman, who claimed he had not seen the

Restraining Order:

> "Well, the Restraining Order restrains Mr. Egan from imposing any restraint on
> the person or liberty of Ms. Egan, threatening, harassing, assaulting, molesting,
> sexually assaulting, attacking her, from entering the family dwelling at Stony
> Corners Road, or wherever she may reside. It grants custody to the two children t
> to her, without any visitation rights. The Restraining Order extends to the
> children, and then there is a further order that says -- 'Respondent shall refrain
> from going to the children's youth groups and activities and choirs a the family
> church, remain 100 feet away from applicant.'" [Tx. May 26, 1998, pg. 3 - 4]

145.    The Hon.Judge Thomas Bishop recited more terms from the Restraining Orders to the defendants Paul Egan, and the defendant, Attorney John Berman.

> "Mr. Egan will become involved with a psychologist --- psychiatrist or psychologist --- I can't read the next word " Immediately, and with the children when appropriate signed by both parties.
>
> [Tx. May 26, 1998, pg. 4]

146.    The plaintiff, Lisa Egan informed the Honorable Judge Thomas Bishop that there were now also new  Criminal Protective Orders barring the defendant, Paul Egan,  from any contact with the plaintiffs, as well as a previous order from the Department of Children and Families dated from April 6, 1998, barring the defendant, PE from contact with his children.

147.    The Hon. Judge Thomas Bishop, after finding that the defendant in Contempt and stated the following admonition to the defendant, Paul E and the defendant, Attorney John Berman, regarding the explicitness of the Civil Restraining Orders.:

148.    "No contact means no contact.  And I don't agree with the concept that that's not in this Order.  NO contact means no contact directly, indirectly, in person, by phone, through a carrier, through a courier, in any way.  You'd better understand the seriousness of this and the consequences of this.

149.    The defendant, Paul Egan, stated in response, "I understand, Your Honor.

150.    On May 26, 1998, the defendant. Paul Egan, and the defendant, Attorney John Berman, were completely aware and informed that there was to be no contact or visitation between the defendant and his children.

151.    On June 23, 1998, the defendant, Paul Egan, and the defendant, Attorney John Berman, appeared at a Hearing on the Criminal Charges, at which the availability of a nolle was laid open to the defendant, under the Family Violence Protection Program, by which he could

have the case disposed of in one year, and all charges expunged if he completed the Family

Violence Protection Program and committed no violation of the Criminal Family Violence

Protective Orders barring him from having all contact with the plaintiffs.

151.    Immediately after the June 23, 1998, the plaintiff was informed by the criminal

court that the defendant, Pual Egan, was going to take the opportunity to receive the nolle by

signing up for the Family Violence education Program

152.    On July 10, 1998,  the defendant, Paul Egan, with the aid of his Attorney, the

defendant, Attorney John Berman, applied for the Family Violence Education Program

Applicatin, Orders, and Disposition under CGS. 46b-38c:  P.A. 87-567, as a way of receiving a

dismissal of all criminal charges against him upon his completion of the program, and in

compliance of its terms as stated:

### Dismissal Application

>   I also request if this application for family violence education is granted,
>   that, upon my successful completion of the program and compliance with
>   all conditions imposed by the court, the court dismiss the charges against
>   me.

And --

>   "Wherefore, the undersigned requests that the applicant be granted Family
>   Violence Education in Accordance wit the General Statutes."

153.    The Family Violence Education Program Application, Orders, and Disposition

form stated the following at the bottom

### "First Order of the Court"

>   "The defendant, is referred to the Family Violenc3e Interventin Unit, and this case
>   is contined pending the submissin of the report of the unti to the Court and too the
>   date indicated below."

154.    The date indicated for a final disposal of the case was for one year hence, on July 9, 1999.

155.    Under the successful completion of all terms of the Family vilence Pevention Program and compliance with the Family Violence Restraining Order accompanying it, which barred all contact between the defendant,   and the plaintiffs, the criminal charges would be dismissed against the defendant, Paul Egan.

156.    The terms of the Family Violence Protection Program were that the def. Had to attend by court order, the NOVA Program, which was a group therapy program for violent abusers, which would take approximately six months to complete.

157.    The terms of the Family Violence Protective Order were :

> This protective order is to remain in effect until final disposition of the criminal case or until further order of the Court.

And -

> "No contact to include Rachel (12/14/84) and Loyal (12/19/89).

158.    The defendant, Attorney John Berman, and the defendant, Paul Egan, were at all times completely aware, and had full knowledge from May 26, 1998 on, when all orders were discussed in Family Court before the Hon.. Judge Thomas Bishop, that there  were therefore now in place two Civil Restraining Orders issued by the Family Court at the Superior Courthouse in Hartford, barring all contact" for six months until October 7, 1998, a Criminal Family Violence Protective Order issued from the Criminal Court in West Hartford, at GA 16, barring all contact until the disposition of the Criminal charges against Paul Egan, which was scheduled for a date of July 9, 1999, one year hence, and a DCF Order requiring the plaintiff to maintain Restraining Orders against the defendant. PE or else yhave her children removed from the home for

subjecting her children to physically and emotionally dangerous encounters with their father, the defendant, PE.

159.    The defendant, Attorney John Berman and the defendant, Paul Egan, knew that under C.G.S. 53a-110b, and 53a-107, to attempt or force or compel any contact in contradiction to all Restraining and Protective Orders mentioned in the above averments, would be a violation of Criminal Law, and constitute a Criminal Offense under the statutes defined.

160.    However, beginning on June 23, 1998, the defendant, Attorney John Berman, and the defendant, Paul Egan, committed fraudulent acts to deceive the Criminal Court into believing that the defendant intended to honor the boundaries and terms in the Family Violence Protective Orders which barred all contact between he and the plaintiff in exchange for a nolle and disposition of the criminal case against him in one year.

161.    The defendant, Attorney John Berman, however immediately filed a Motion dated June 24, 1998, drafted just one day after the defendant, Paul Egan had gone to a hearing regarding the still pending Criminal changes against him,  seeking "reasonable parenting time with his minor children"

162.    The Motion was filed on June 26, 1998..

163.    Though the defendant Attorney John Berman  knew that they had no legal right to visitation, and that all Civil and Criminal Protective Orders explicitly  barred visitation, the defendant, Attorney John Berman, made no mention of all of the protective Orders or the DCF Order, all of which barred the defendant Paul Egan from any visitation with his the child plaintiffs Rachel and Loyal Egan.

164.    point of view  that any visitation between the defendant, Paul Egan, and his children, plaintiffs, Rachel Egan and Loyal Egan, would be absolutely illegal and in direct

27

violation of all the Court Orders averred, Orders issued to ensure the safety of the children, as well as their mother, who had already been victims of habitual violence, and who were entitled to the relief granted. them.

165..   The defendant, Paul Egan, having been a party to the Criminal Court Agreement, the Civil Restraining Orders, the Criminal Protective Orders, and the Department of Children and Family mandates, had full and complete knowledge that any visitation or contact was illegal, and that to make contact or force contact would be in violation of the statutes listed on the documents he had in his possession telling him so..

166.   The defendant, Attorney John Berman, and the defendant, Paul Egan, when committing that coercion and extortion through the letters written and sent to the plaintiff, Lisa Egan, in the summer of 1998,  intentionally withheld funds from the plaintiff, Lisa Egan, when she refused to comply with their  demands for the illegal visitation, funds they knew were necessary for the feeding and housing of the two child plaintiffs, Rachel Egan, and Loyal Egan,

167.   The funds were the only money coming into the household  as the plaintiff, Lisa Egan, was unemployed, had been a stay at home mom for the length of the marriage, and at that time was completely uneducated and unskilled.

168   The defendant, Attorney John Berman, and defendant, Paul Egan, admitted in the letters that their purpose in withholding the support funds, was punitive retaliation for the plaintiff, Lisa Egan, refusing to allow the visitation to occur, and refusing to sign and return the Case Management Form agreeing with their terms on it, though she did not.

169   The defendant, Attorney John Berman facilitated his client, in the commission of a crime by committing coercive acts against the plaintiff, in an effort to for her to allow into allowing illegal visitation.

170..    The defendant, Atotrney John Berman's facilitation of the coercion was done to facilitate the commission of another crime, that being the violation of the statutes known as C.G.S. 53a-110b and 53a-107

171.    The defendant, Atornery John Berman conspired to prevent the plaintiffs from enjoying the protection and safety entitled to them under the Fourteenth Amendment of the Constitution and the Connecticut Constitution, Art. 1 Sec. 8..

172.    The defendant, Attorney John Berman at all times knew that by his actions he was violating the Attorney Code of Ethics, and that but is in itself a criminal offence, and the subsequent extortion, and coercion committed, criminal offenses also.

173.    . On June 25, 1998, the defendant, Attorney John Berman sent a letter to the plaintiff, Lisa Egan, along with a Case Management Form pertaining to the newly filed Divorce action.

174.    The Case Management form had already been filled in as the sections regarding the type of case, status of case, and all discovery scheduling dates, as chosen and defined by by the defendants Attorney John Berman and Paul Egan.

175.    The letter, sent by the defendant, Attorney John Berman, stated the following demand -

> .    Enclosed please find Case Management Agreement for your signature.  This agreement must be signed by all parties and returned to court before a hearing date can be  scheduled Please sing the same where indicated and return it to my office in the enclosed, self-addressed envelope,.  Thank you.

176.    The plaintiff knew that the statement "This agreement must be signed by all parties and returned to the Court before a Hearing date can be scheduled was blatantly false, and made with intent to decieve the plaint into moving the case in the defendant time table, and

according to the defendants choosing of scheduling dates with no imput from the plaintff being allowed.

177.    The plaintiff knew this herself because she had already been given her own Case Management Form JD-FM-183 when she filed for the Divorce on May 7, 1998.

178.    The plaintiff herself, by the time she had received the def. Letter and case managemen for, had already decided to not return the Case Management form to the court in advance of the Hearing since she knew the issues were to be highly contested, and to instead wait and show up on Sept. 8, 1999 for the case mangagemnt Hearing, and file the Case Management Form then, which was her legal Due Process Procedural Right.

179.    The plaintiff, Lisa also knew that according to the Form, she did not have to agree to the discovery dates arbitrarily chosen by the defendant, nor was she inclined to until she found an attorney who could tell her if they were appropriate or feasible

180    The instructions at the top of the Case Management Form told her that it was her legal right to make those decisions herself, as the instructions were  as follows:

181    "You must file this agreement with the court on or before the case management date shown below or appear in person on the Case management date.  If you fal to do one or the other, your case may be dismissed.

182.    If the parties nneed a scheduling conference wit hthe court, they should come to the court with their attorneys, fi they have attorney, on the case management date.

183    The Case Management Hearing date was listed directly on the form as September 8, 1999.

184.    As a result, the plaintiff, the plaintiff, Lisa Egan, phoned the defendant's Office and left a message on his voicemail, telling him that she would not be returning the Case

30

management form to him but intended to go to the hearing on September 8, 1998 instead.

108    The plaintiffs, incorporate items 1-107 into this Count of this Complaint and further allege:.

109.    In August of 1998, when the plaintiff, Lisa Egan, attempted to hire an attorney, one Emily Moscowitz, to represent her interests and protect the interests of her children, Rachel and Loyal Egan, the defendant, Attorney John Berman, interfered with that attempt.

110.        On August 7, 1998, Attorney Emily Mosiccowitz filed her Appearance on behalf of the plaintiff, Lisa Egan.

111.        Attorney Moscowitz had assured the plaintiff that the defendant, Attorney John Berman's coercive letters, and numerous other attempts by Motion to circumvent the standing Criminal Protective Orders, Family Violence Protective Orders, and Restraining Orders, and mandate of Department of Children and Family Services would not succeed, as any visitation was barred by the protection granted.

112.        Attorney Moscowitz immediately filed a Motion to the Court for Attorney Fees to be paid by the defendant, Paul Egan, a Motion requesting that the Restraining Orders Incorporated into the Divorce File, and a Motion for Pendente Lite Child Support and Alimony.

113..        The night before the Hearing however, Attorney Moscowitz's secretary phone the plaintiff, Lisa Egan at her home at about 7:30 inn the evening,. and told the plaintiff, Lisa Egan, that the next day she was going to lose on the visitation issue, and that the defendant, Paul Egan, would get visitation.

        The plaintiff asked the secretary to have Attorney Moscowitz immediately call her back that very night to discuss the complete change to what the plaintiff, LE had been told before.

114.           When Attorney mosc. Called the plaintiff, Lisa Egan , late that evening,

the plaintiff asked Att. Moscl how the visitation could take place in light of all of the Restraining

Orers and Protective Orders, that were still standing.

Attorney Mosc. would not explain, but told the plaintiff that that was the

way things were, and she told the plaintiff to trust her.  She also told the plaintiff that only day of

visitation would be ordered, and that that one day would be supervised visitation.

The plaintiff, L.E. relied on the representaiton of Attorney Moscowitz an

believed she had no choice regarding the visitation despite her fear for herself, or her son, child

plaintiff, LE, and despite the existence of all of the Restrinaing and Protective Orders still

standing.

115.           On August 19, 1998, the plaintiff, Lisa Egan, the defendant, Paul Egan, and the

defendant, Attorney John Berman, met at the Superior Court along with Attorney Moscowitz.

The defe. And Attorney Emily Moscowitz went into a conference room alone and

when they came out the plaintiff was told that the visitaiton would be unsupervised, not

supervised as she had said the night before.

Then the plaintiff, Lisa Egan, the defendant, Paul Egan, the defendant, Attorney

John Berman, and Attorney Moscowits went into the conference room together to discuss the

Motion for Attorney Fees for Attorney Moscowitz, Motion for Incorporatin of the Restraining

Orders into the Divorce File, and Motion for Pendente Lite Child Support and Alimony, and the

defenant, At. B. Motion for Visitaiton..

117.           The defendant, Attorney John Berman, and Attorney Emily Moscowitz,

agreed to the Visitation date of August 22, 1998, despite the existence of all of the Protective

Orders averred above, and then the defendant, Attorney John Berman agreed to have the

defendant, Paul Egan, pay a retainer to Attorney Moscowitz, writing it on a piece of paper, which then slid across the table to Attorney Moscowitz, but still kept his hand on..

118.     The plaintiff, Lisa Egan, then tried to speak up and brought up the Restraining Orders, and their possible Consolidation though she did not understand at the time what that meant, only that it was in her interest to have them Consolidated according to what Attorney Emily Moscowitz had told her previously..

119.     When Attorney Emily Moscowitz began to attempt to discuss the possibility of the Restrianing Order being Consolidated into the Divorce Case, the defendant, Attorney John Berman, pulled the paper back across the table, and rescinded his offer to pay the Attorney Fees, to which then Attorney Moscowtiz reached for the paper again, and said they could forget about the Restraining Orders, and keep things nice.

When the plaintiff, LE attempted to question about the ommison of the incorporation, Attorney Moscowitz told the plaintiff that they would deall with it in the future.

When the parties left the room and the aggreement was drawn up, the plaintiff saw on the agrreement, that it was for two visitation dates not one, the dates of August 22, 1998 and August 29, 1998. When the plaintiff questioned Attorney Mostiowitz about the second date, she was told that she had no choice but to allow the second visitiation to take place.

120.     The plaintiff, Lisa Egan, unaware at that time, that the visitations, though agreed to and arranged by the defendant, Attorney John Berman, and Attorney Emily Moscowitz, were still absolutely illegal, and believed she had no choice but to let the visitation take place as she was told to do so by her Attorney Emily Moscowitz..

The plaintiff did as she was told and signed the agreement.

121,     When the plaintiff, Lisa Egan, the defendant, Paul Egan, the defendant,

Attorney John Berman, and Attorney Moscowitz stood moments later in front of the Honorable

Judge Mack in Courtroom 300 to tell the Court that the parties had agreed to a Visitation

schedule and weekly pendente lite Child Support, neither attorney ever mentioned or disclosed

the existence of the Civil Restraining Orders, Criminal Family Violence Protective Orders, and

Department of Children and Family Services Orders.

The def. And Attorney Msocowitz had deliberately conspired without the laintiffs

knowledge to deprive the plaintiffs of the protection guaranteed them by the laws of the state of

Connecticut, and th eFourteenth Amendment to the United Satate Constituioan.

without the knowledge oo fthe plaintiff,, Lisa Egan, had just were never mentioned by the two

Attorneys, and the visitation so ordered.

The defendant knew htat in not disclosing the existence of all of the protective orders, he

was attempting to circumvent them, and violate the both the criminal statutes known as C.G.S.

53a-110b, and 53a-107, as well as the Due Process Procedural and Substantive Rights of the

plaintiffs.

The Honorable Judge Mack accepted the Aggreement.

From August 19, 1998 through the following weeks, the plaintiff made 10

phonecalls to the office of Attorney Moscowitz, in attempt to find out what Incorporation of the

Restraining Orders meant, as she worried they had lost something of value in the negotion that

took place in the conference room, or else the defendant, Attorney John Berman would not have

attempted to take back the fee had had offered to pay for Attorneyh Moscowitz representation of

the plaitniff..

Attorney Moscowitz would not return any of the plaintiff's phone calls,

When the plaintiff learned at a legal services clinic at the Superior Courthouse of

the importance of the Incorporation of the Restraining Orders, she tried to reach Attorney Moscowitz again.

When the plaintiff finally spoke with Attorney Moscowitz, on August 24, 1998, about Incorporation and Extension of the Restraining Orders, Attorney Moscowitz hedged as to whether she felt the Incorporation or Extension was necessary.

22.     On August 29, 1998, at the second scheduled visitation, the defendant, Paul Egan, committed an aggressive physical act against the plaintiff in plain view in a public place and in the presence of the child plaintiff, Loyal Egan.

The defend. Blocked in the plaintiffs car, refusing to let her leave, and standing at the drivers side window, threw the mail directly at the plaintiff's face, hitting her in the face as she was sitting in the drivers seat in her car asking him to let her leave.

The child plaintiff, Loyal Egan, was sitting in the back seat and was a witness to the aggressive act, the plaintiffs' request to leave, and the blocking of the car.

125.     The defendant, Attorney John Berman, by arranging and forcing visitation to take place in direct contravention to all of the Protective Orders averred in this Complaint, and arranging that visitation by the use of money as both a bribe and a method of extortion to achieve his end, had facilitated his client, in the commission of a violent act against the plaintiff..

126.     The plaintiff, Lisa Egan, suffered the harm of another physically aggressive act, and though not severe in nature, an act which was nonetheless unwanted and humiliating, and committed in the presence and full view of the child, Loyal Egan, who was then 7 years old, an act he had a right to be protected from witnessing..

127.     The defendant, Attorney John Berman, did not have the legal authority to circumvent Protective Orders, Restraining Orders, Family Violence Protective Orders, or

mandates from the Department of Children and Family Services,.

128.        The defendant, Attorney John Berman, did not act with candor toward th Court on August 19, 1998, when he had a duty to disclose to the Court that there were standing Restraining and Protective Orders, and Mandates by Department of Children and Family Services, barring any visitation from taking place, and made no such disclosure.

.    129..        The defendant, Attorney John Berman, knowingly, deliberately, and intentionally put the plaintiff, Lisa Egan, and the child plaintiff, Loyal Egan, at risk of physical and emotional harm from his client, the defendant, Paul Egan, a man he knew to be dangerous to the plaintiffs, and who subsequently harmed the plaintiffs as a result of the defendant, Attorney John Berman's facilitation of the visitation.

The plaintiff, immediately after the events of August 29, 1998, tried to reach the Att. M to seek her assistance in making sure that the Restraing Orders which were due to expire on October 7, 1998, would be granted an extension of another six motnh.

The plaintiff left many messages for Attorney Moscowitz,relating what had taken place at the visitation on August 29, 1998, and asking for her to file for Extensions of the Restriaining Orders.  The plaintiff got no response from Attorney Moscowitz for nearly two weeks.

After tring for over two weeks with no response, the plaintiff finally spoke with Attorney Moscowitz, who promised she would make a Moiton to extend to no avail.

On Septebmer 14, 1998, the plaintiff le and the child plaintiff re filed Motions for Extension of their Restaitng Orders which covered themselves and the child plaintiff, Le, in order that they be heard before their expiration on October 7, 1998.

That evening, the plaintiff, phoned Attorney Moscowitz and left the

message that she had filed the Extnesion herself since she had not heard from Attorney Moscowitz in three weeks.

The following day, on September 15, 1998, Attorney Moscowtiz phoned the plaintiff to go down to the Court and dump her Motions for the Extension of Restraining Orders, promising that she would file for them instead.

That same day, September 15, 1998, Attorney Moscowi typed up her bill for $1,500 and mailed it that day to the plaintiff, Le along with a copy of a Motion for Extension of Restraining Orders bearing the same date of September 15, 1998.

However, Attorney Moscowitz Motion for Extension of Restraining Orders only dealt with the plaintiff Le and the child plaintiff, Rachel Egan, the child Loyal Egan being left conspicuously off the face of the motion.

The plaintiff however never did dump her own Motion fro Extension of the Restraining Orders, nor did the child plaintiff, Rachel Egan, dump hers, because she was worried that the expiration date would pass by mistake due to the delay of Attorney Moscowitz filing of her motion.

One week later, when the plaintiff learned of the existence of the Victims Advocate at the Criminal Court located on Lafayette Street in Hartford, and went their to find out what if anything she could do about having to be subjected to the threatening behavior of the defenant,

123.        The Victims Advocate explained that the visitations were illegal and that the plaintiff, Lisa Egan, and her children, Rachel Egan, and Loyal Egan, still had rights to their protection of all of their protective Orders under the law, and that the Restraining Orders should have been consolidated into the Divorce File to ensure the Courts knowledge of safety

issues, particularly since their were children involved..

The plaintiff, Lisa Egan, as a result of the information given to her by the Victims Advocate on September 21, 1998, immediately phoned Attorney Emily Moscowitz , and told her that she would be discharging her from her representaition.

On September 22, 1998, the plaintiff wrote a letter to Attorney Moscowits, asking her to immediately withdraw her appearance, as the plaintiff now knew for certain that the defendant, At. Had conspired with Attorney Mosciowti to deprive the plaintiffs the safety and protection of their Fourteenth and First amendment Rights as guaaranteed under the United States Constitution and Connnecticut Constitution Art. 1 Sec. 8..

On September 23, 1998, the plaintiff went down to the superior Courthouse and re-entered her appearance as a pro se.

While at the Courthouse, the plaintiff filed Motions for Consolidiatin/incorporateio of the Restrinaing orders in to the Divorce file, Motin for Attorney Fees, and a Motion for of the pendente IIte child Support and alimony fees which were not being paid in full at that time, and checked on the status of the Motions for Extension of Restraining Orders, both hers and Attorney Moscowitz.

he Mtion for extension of Restraiing Orders, dated September 15, 1998, that Attorney Moscowits had mailed to the plaintiff, and for which she had told her to dump her own Motion, was never filed in Court.

On September 30, 1998, at the Hearing before the Honorable Judge Thomas Bishop pm the Motions named in averrment   , the defendant, Attorney B. argued for the defendant to be able to have visitiation, and that the Restraining Orders would be lifted so that could take place.

38

The Honorable Judge Bishop did not have coppies of the Civil Restraining Orders as they were in another file not present in the Courtroom and asked Attorney Berman if he had a copy. Attorney Berman said that he did not.

When the Honorable Judge Bishop asked whether the Civil Restraining Orders which were the subject of the plaintiff Moitn for Extension, explicitly barred the def. Pe from any access to the children, the defendant, Attorney John Berman, without having the benefit of looking at the Restraining Orders which he claimed he did not have on his possession, answered the word "Yes" without hesitation.. [Tx. September 30, 1998, pg. 21]

The defe. Answere of the word "yes" was a judicial admission to knowledge and understanding that the defendnat, pe was not entitled to visit with his children, and that Attorney John had known that all along back on August 19, 1998, when he set up the two visitation days with Emil.

When the Court still expressed its unsurity as to the level of bar to access to the plaintiffs the Restraining Orders offerd, the defe. Attorney John Berman made a false statement to the Court.

A by standing Family relations officer, thinking they might have been involved in the Restraining Orders, which they were not, spoke up and said "As I recall, it was -- it was limited, and tehrer were problems with it. It came back to court after I -- a couple of times after I---" [Tx. September 30, 1998]

Then Attorney John Berman affirmed the individual's statements which were erroneous, as only Laura Furniss had ever been involved with the Restraining Orders on the day of their original issue on April 7, 1998.

The defendnat, told the court that the Restraining Orders had been revised several

times, which was a false statement made with the intent for the Court to rely upon it.

Attorney Berman stated: "It was revised several times".

There had been only ever been one revision of the Restriain Orders # 3012iiooh, that revision having been done by Judge Bisnop himself on May 26, 1998, a revision shich tightened the restriction on the defen and created a greater bar to access to the plaintiffs as a result of the defendants violation of the Restrainging Order and Judge Bishops having found him in Contempt.

After the plaintiff disclosed the nature of the Civil Restraining Orders, the Court decided to Extend them indefinitely until further Order of the Court, as the Orders themselves still could not be seen by the Court on that particular day.

During that Hearing on September 30, 1998, the def. Deliberately chose to not disclose to the Court that there were Criminal Protective Orders in criminal court barring all contact between the defe.and the child plaintiffs and pl., which made any discussion of possible visitation being aquired by the defendant at that point moot and frivolous.

The defendant, argaud for an order of visitiation in direct contravention to the Criminal Family Violence Protection Orders still standing in Criminal Court which were to remain in effect until the dismissal of the Criminal claims agains the defendant, in July of 1999, nearly ten months away.

At no time either in the Hearing did the defe. Disclose that their were Orders from DCF barring Contact between the defen and the child plaintiffs else they would be removed form the custody of the plaintiff, and placed in state care by reason of endangerment if the Restraining Orders were not maintained.

The defendant, as an attorney, had a duty to disclose the existence of

40

theose orders to the Court on September 30, 1999, a duty he did which he did not honor.

The defendant knew htat in not disclosing the existence of all of the protective orders, he was attempting to circumvent them, and violate the both the criminal statutes known as C.G.S. 53a-110b, and 53a-107, as well as the Due Process Procedural and Substantive Rights of the plaintiffs.

The defendnat, as the attorney for the defe. Pe, knew htat it was a criminal offense for him to facilitate the violation of theos Criminal Protectifve Orders,a dn a criminal violation for his client to violate those Criminal Protective Orders.

The defendant, further knew that the terms of the defena opportunity to receive a noole and a wiping away of his criminal record was dependent on his not violating the crim. Protect orders, ad of his mainting and honoring the boundaries legally diemanded of him.

The defe. In not disclosing the existence of the Criminal Protective Committed fraud to the Court on September 30, 1998, in seeking a benefit for his client that he as an attorney knew his client had no entitlement to receive.

On October 7, 1998, the parties returned to Family Court to litigate the plaintiff, le motin for Attorney Fees.

At that Hearing, the plaintiff, told the Honorable Judge Thomas Bishop what had occurred between the defe. And aTtorn. Mosc. The plaintiff spoke for four pages of transcript, and told the Court in minute detail what had transpired betweent he defeant and Attorney Moscowitz as stated in this Complaint.

At no time during the course of the plaintiff's teleing of those events, tied the defe. Attl John Berma or P.E ever attempt to contradict her story, or to make explanation of it to the Court.

The def. Never adressedthe allegation and remained silent, which was a judicial admission to facts as the plaintiff described them, as he would naturally have denied such an allegation if it were untrue.

The plaintiff also told on October 7, 1998, that f Attorney Berman had sent her numerous letters during the summer of 1998, the contents of which was an attempt to force the plaintiff, Ie into allowing the def. P. egan visit with his children else suffer a drop in the support he was giving her which was her sole income at that time.

The plaintiff le mention the numerous cecks for $300, and the defendant threat to reduce that amount if the plaintiff refused to give in to allowing him the visitioan. The plaintiff further stated the amount of support she was then reduced to receiving, that amount being $100 since she refused to cooperate with the def. Demand.

At no time during the course of the plaintiff's teleing of those events, tied the defe. Attl John Berma or P.E ever attempt to contradict her story, or to make explanation of it to the Court.

The def. Never adressedthe allegation and remained silent, which was a judicial admission to facts as the plaintiff described them, as he would naturally have denied such an allegation if it were untrue.

On October 14, 1998, the defendant filed another Motion for Visitation stating the following:

"Defendant represents that the plaintiff wife refuses to allow him to have visitation with his children.

Wherefore, the Defendant moves for an order allowing him reasonable parenting time.

42