No where in the Motion does the defendant disclose the fact that there are Civil

Restrainging Orders an Criminal Protective Orders barring visitation from taking place, as well

as the DCF order mandating the plaintiff to maintain Restraining Orders or else lose custody of

her children to the state.

The defendant had a duty to not litigate frivious motions to the court for benefits he is not

entiled to have by law

The defenant, as an attorney had a further duty to disclose to the Court on other

controlling Orders that would affect his request for Visition which he did not do in any way.

The defendant knew htat in not disclosing the existence of all of the protective orders, he

was attempting to circumvent them, and violate the both the criminal statutes known as C.G.S.

53a-110b, and 53a-107, as well as the Due Process Procedural and Substantive Rights of the

plaintiffs.

On December 4, 1998, the defendnat filed another Motion for Visitation :Pendente Lite

which stated the following:

The defendant husband has been denied visitation with his son Loyal since August

29, 1998.

Wherefore, the defendant moves that he be granted reasonable rights of visitation with his

minor son Loyal.

No where in the Motion does the defenant disclose the fact that there are Civil

Restrainging Orders an Criminal Protective Orders barring visitation from taking place, as well

as the DCF order mandating the plaintiff to maintain Restraining Orders or else lose custody of

her children to the state.

The defendant had a duty to not litigate frivious motions to the court for benefits he is not entiled

43

to have by law

The defenant, as an attorney had a further duty to disclose to the Court on other controlling Orders that would affect his request for Visition which he did not do in any way.

The defendant knew htat in not disclosing the existence of all of the protective orders, he was attempting to circumvent them, and violate the both the criminal statutes known as C.G.S. 53a-110b, and 53a-107, as well as the Due Process Procedural and Substantive Rights of the plaintiffs.

On December 22, 1998, when the plaintiff, le attempted to litigate a Contempt against the defendant, Pau for violation of the Restraining Orders on August 29, 1998, the plaintiff was informed by the Honorable Judge Moore that she could not address the issue of Contempt because the plaintiff and child plaintiff le had willingly gone to the visitaiton spot, and therefore violated the terms of the Restraing Order, making them unenforceable on that occasion.

The Honorable Judge Moore told the plainttiff le and the defednna that no visitiation could take place because it was contradictory to the Civil Restraining Orders, and in violation of them, any visitaiton occurring making them then moot and unenforceable, and denying the plaintiff, le any remedy for the aggressive act that she alleged had occurred.

The honor. Judge moor further stated that if the plaintiff were to again allow the violation of her own restraining orders in the future, she would again be without remedy in that instance if another aggressive incident occurred.

The honorable judge More spoke for two pages on the issue of the contact defeating the protection of the Restraining Orders, and causing violation of the restrainging Orders, and her confusion as to how any of the visitaiton took place in light of the existence of the Civil Restraining Orders in the first place.. [Tx. December 22, 1998]

The hon. Judge moore further could not find any copy of an order for visitiation in the file, only the hand written agreement of the defendant, attorn. Pe Emily and the plaitn. Lle.

The hon. Judge moore finished by stating that as long as the Civil Restraining Orders were in effect, the parties would have to work out some other type of situation.

The defe. Attorney John Berman and Pe were both present at the December 22, 1998 Hearing before Judge Sherian Moore.

AT no time during the Hearing did the def. JB Pe ever disclose to the Court that the visitioan on August 22, and Augst 29 had not only bben in contradiction to the Civil Restrainng Orders, but that those visiation had occurred in violatin of the Criminal Family Violence Protective Orders and in bold face defiance of the mandates and terms that Paul Egan had promised to follow in order to have the criminal case against him dismisses as part of the Family Vioence Education Program he was receiving a nolle for.

AT no time during the Hearing did the def. Ever disclose to the court that they had had actually facilitated nad participated In a the breaking of the criminal statutes known as Paul e. had criminal statutes known as

130.        The plaintiffs incorporaate the items averred in items into this Count of this Complaint and further allege:

134.        On January 8, 1999, the defendant, Attorney John Berman, used  methods of coercion, extortion, and threats, to once again attempt to force the plaintiff, Lisa Egan, into allowing his client, the defendant, Paul Egan, to have illegal visitation with his son, child plaintiff, Loyal Egan.

135.        The defendant, Attorney John Berman, knew that the child plaintiff,

45

Rachel Egan, then 13 years old, needed to have her Financial Aid forms completed in order to get her scholarship money for her tuition, so that she could attend private high school.

136.        The defendant, Attorney John Berman knew that the child plaintiff, Rachel Egan, though only in 8th grade, had scored one point off perfect on the SAT College Board exam verbal section, receiving a score of 790, and a math score of 680, which put her eligible by score for Harvard at only 13. As a result of that score and other talents, academic and otherwise, the child plaintiff, Rachel Egan, who had also scored perfect scores on the Private School SSAT entrance exams, was being offered a place at every private high school she applied to. The only issue for the child plaintiff, was the tuition,

137        The defendant, Attorney John Berman knew that the plaintiff, Lisa Egan, and child plaintiff, Rachel Egan, would not have the ability to satisfy the tuition unless the child plaintiff, Rachel Egan, received Financial Aid, as the plaintiff, Lisa Egan, did not have the funds to send her daughter to private school without financial aid, and most of the completive private high schools have bylaws preventing Merit Scholarships, so all financial aid is need base...

138.        The defendant, Attorney John Berman, and the defendant Paul Egan, were informed by the plaintiff, Lisa Egan, that a document known as the Parents Financial Statement, known as PFS, had to be sent to a national organization in Princeton, New Jersey, an organization that verifies the income of both parents because it is granted access to IRS files and filings, and makes an unbiased determination of financial need which it then sends back to all private high schools and all colleges to aid them in making determinations of grants, based purely on financial need.

139.        The defendant, Attorney John Berman, and the defendant, Paul Egan, knew that the Parents Financial Statement, PFS, needed to arrive in Princeton, New Jersey, by

the deadline of Friday, January 15, 1999, or the child plaintiff, Rachel Egan, would definitively

lose all opportunity to receive Financial Aid, and consequently be denied the chance to attend

private high school though she had academically earned her place.

140.        The defendant, Attorney John Berman and the defendant, Paul Egan, knew

that a portion of the PFS form had to be filled out by the defendant, Paul Egan, as his income and

assets were relevant to the determination of need, and that omission of his income or

misrepresentation of his income would result in the child plaintiff, Rachel Egan, being flatly

denied any financial aid at all..

141.        The defendant, Attorney John Berman, and the defendant, Paul Egan,

knew that it was mandatory that copies of the defendant, Pual Egan's W-2's and previous and

current 1040s be sent to Princeton and the private schools, as part of that application for aid.

142.        On Wednesday, January 6, 1998, the plaintiff, Lisa Egan spoke with  the

defendant, Attorney John Berman, in the courthouse, and reminded him that the child plaintiff,

Rachel Egan, needed her Financial Aid, and that the deadline for the PFS required documentation

of income, or she would be denied any financial aid..

That same day of Wednesday January 6, 1998, the parties had gone before

the Honorable Judge Thomas Bishop to move the Divorce Case forward and obtain a Trial Date.

At that Hearing a visitation schedule was put into place that th eplaintiff, Lis Egan believed she

had no right to object to as Family Relations had issued it.

However, Fmaily Relations, when they made their recommendation,  had

no idea of the existene of the Criminal Protective Orders, the DCF Orders, or the Civil

Restraining Orders in place against the defendant, PE,

The defednat, Attorney Joh Berman once again did not disclose the existence of

47

any of the protective orders to the Court, though he had a duty to, and in not disclosing was facilitatin his client in breaking those Civil Restraining and Criminal Protective Orders, as well as braking the aggreement that the defenatn, Paul Egan had sworn to obey as a condition of the nolle of the criminall charges .

The plaintiff did not disclose because she thought that Family Relations knew of all of the Ordrs.

The following day on January 7, 1998, the plaintiff spoke with family Relaitons Officer Margaret Romanik to find out how to go about the visitaiton when the all of the Restraining Orders were still protecting the plaintiffs.

Family Relaitons officer, Margaret Romanik, then stated that she was completely unaware that there were standing Rstraining Orders and standing Criminal Protective Orders against the Defendant, and that the visitation ordered without knowledge of those standing Orders would be in violation of those Orders if commenced.

Family Relations officer Margaret Romanik then told the plaintiff that all Civl and Criminal Protective Orders had to get Modified to allow for the visitation before any visitation could take place.  Margaret Romanik then told the plaintiff that she would call the defend. AB and inform him of that fact.

Margaret Romanik made an attempt to reach the defendan. But she only got his voicemail, and so left him a message.

Margare Romanik then phoned the plaintiff back and told her that she had left a message on the def. Voicemail, informing him she had been unaware of the Civil and Criminal Restraing Orders when she had made her recommendation for visitation, and that the visitation could not now take place until the orders were modified to allow for it.

48

On Thursday January 7, 1998, and Friday, January 8, 1998, the plaintiff herself had left messages on the def voicemail informing him of her inability to go forward with the visiation until he Modified the Orders, or they would all be breaking the law.

The defendant, phoned the plaintiff back, and left her messages on her answering machine indicating tha the was expecting her to go forward with the visitation on the following Saturday, despite the Orders barring it in both Criminal and Family Court.

143.        On Friday, January 8, 1999, the plaintiff returned the defendant, Attorney John Berman's phone call, and took what she believed to be a necessary precaution against him implicating her in the commission of a crime.

The plaintiff, at that time compleely unschooled in the law, owning only one practice book, was frightened of what she could be accused of or forced into, and being already stressed and traumatized by the level of dishonesty she had encountered previously with other events averred in this complaint up until that time, did not know what else to do.

The plaintiffs all pianists of some level, had a large tape recorder by the piano within a few feet of the telephone.

The plaintiff moved it next to the phone, plugged in the microphone, and turned the tape recorder on as the only way she knew how to protect herself from any criminal allegation or scheme that the defen. Was attemptin to engage her in.

The plaintiff knew it ws illegal to tape record someone, but she knew of no other way to protect herself and her children any more but to do it anyway.  She believed she had no choice.

144.        The defendant, Attorney John Berman, during that telephone call on January 8, 1999, employed  methods of coercion, and extortion,  to attempt to force the plaintiff,

49

Lisa Egan, into once again allowing his client, the defendant, Paul Egan, to have illegal unsupervised visitation with his son, child plaintiff, Loyal Egan.

145.    The defendant, Attorney John Berman, refused to turn over the PFS form and financial documentation, unless the plaintiff, Lisa Egan, agreed to allow his client, the defendant, Paul Egan, to violate all of the protective orders and have visitation.

146.    The defendant, Attorney John Berman, told the plaintiff, Lisa Egan, that he wanted her to violate the protection of her own Civil Restraining Orders, and her own Criminal Protective Orders.

146.    The defendant, Attorney John Berman, expressly and explicitly told the plaintiff, Lisa Egan, that he wanted her to have the child plaintiff, Loyal Egan, violate the protection of his Restraining Orders and Criminal Protective Orders also.

147.    The defendant, Attorney John Berman, told the plaintiff, Lisa Egan, that he wanted to agree to allow him to vacate her Criminal Protective Orders, and to not contest that vacation, or show up for the Hearing on the issue.

148.    The defendant, Attorney John Berman, told the plaintiff, Lisa Egan, that she and her children did not need the Criminal Protective Orders, as Civil Restraining Orders, offered the same protection.

The defendant Attorney John Berman told the plaintiff, Lisa Egan, that jurisdiction was under the divorce case in the Superior Court in Hartford, rather than in the Criminal Court.over her instead othe Criminal Court.

149.    The defendant, Attorney John Berman, told the plaintiff, Lisa Egan, that

her interests would not be prejudiced by the vacation of her and her children's Criminal

Protective Orders.

150.    The defendant, Attorney John Berman,.told the plaintiff, Lisa Egan, that

most people don't get Criminal Protective Orders, but that they get Civil Restraining Orders

instead , issued by the Superior Court not Criminal Court, and that those Civil Restraining Orders

grant the same level of protection.

151.    The defendant, Attorney John Berman,  told the plaintiff, Lisa Egan, the

Civil Restraining Orders, and Criminal Protective Orders are identical and carry the same

penalties.

152.    The defendant, Attorney John Berman, told the plaintiff, Lisa Egan, that he

wanted her to violate the rules and terms listed on the Civil Restraing Orders, and Criminal

Protective Orders until he could get them Modified or Vacated.

153.    The defendant, Attorney John Berman, admitted to  the plaintiff, Lisa

Egan, that what he was asking her to do was in direct violation of the Criminal Protective Orders

and Civil Restraining Orders, but that he wanted her to do it anyway.

154.    When the plaintiff, Lisa Egan, tried to say "no" and bring up the Financial

Aid Form and deadlined income documentation, the defendant, Attorney John Berman, told the

plaintiff, Lisa Egan, he was hanging up on her, that he wanted her to think it over, and to think

about allowing him to vacate her Criminal Protecive Orders in trade for the Financial Aid Forms

for the child plaintiff, Rachel Egan.

CLAIM FOUR

`   155.           On the following Thursday, January 14, 1999, the plaintiff, Lisa Egan,

went to the law office of the defendant, Attorney John Berman, to hand deliver a letter she had

written the day before, which was dated January 13, 1999.

156.           The plaintiff, Lisa Egan's letter, dated January 13, 1999, letter spoke of the

immediate need for the PFS financial form, and other related income documents, and of her

adamancy to continue to disallow visitation to take place while all of the Civil Restraining

Orders and Criminal Protective Orders still stood.

The letter further informed the defendnat, AB, that the plaintiff, Le,

believed that he was committed an act of coercion against her in trying to force to go through

with the visitaiton.

157           When Pl. arrived at the law office, she asked the secretary to sign for the

letter.

Before the secretary could sign for the letter, the defendant, Attporney

John Berman, and came out to the reception area and volunteered to personally sign for the

document, and date his signature, which he did.

Immediately after signing and dating the envelope containing the letter, the

def. AB, asked the plaint. LE to come back to his conference room to talk.

The pl. Le. Not wishing to be further coerced, asked that the defe. AB first

read her letter.

The defe. AB opened the envelope and immediately read the letter

52

addressed to him.

158        After reading the letter, the defendant, Attorney John Berman,
asked the plaintiff to come into a conference room in the central part of the office, a room with
two separate entrances leading out to the main corridor, of which both doors were wide open.

159        The defendant, Attorney John Berman, then employed methods of
coercion, extortion, and threats to again force the plaintiff, Lisa Egan, to give in to his demand
that she allow the defendant, Paul Egan, to break the law by allowing him to have visitation with
the child plaintiff, Loyal Egan, in violation of both the standing Civil Restraining Orders, and
standing Criminal Orders, and the terms of the defendnat, Paul Egan's nolle in Criminal Court..

158.        The plaintiff, Lisa Egan, who never sat down from the beginning, and was
standing opposite the seated defendant, Attorney John Berman, became emotional at the audacity
of the defendant, Attorney John Berman, making his statements and committing his acts of
coercion despite the letter he had in his hand, and despite the two conference doors being open,
and other employees walking by.

The plaintiff, L.E., refused to submit to the coercive tactics of the def. AB,
and explicitly refused to allow the def. PE to have visitation with his son in violation of the  the
Civil Restraing Orders, and Criminal Protective Ordrs.

The plaintiff L.E. walked out on the def. AB and abruptly left the law
offices of Berman, Bourns & Currie LLC.


39.        Approximately one hour later, upon pulling into the driveway of her home in
Avon, at 65 Stony Corners Road, the plaintiff,LE, was greeted by the chil. Pl. RE. Standing at the
front door of the house with a message from the def. AB.

The defen. AB had just phoned the house, and told the child plaintiff. RE to tell the plaintiff, LE, that the financial aid forms would be at the Centerbrook Post Office in the morning as she requested, and that the defendna,t Paul Egna would meet his son, child plaintiff, Loyal Egan, at the drop of spot in West Hartford for visitaiton on Saturday morning.

The plaintiff, LE. Immediately went to the telephone, and retruned the defe. AB phonecall at his law office located at 940 Farmington Avenue.

The plaintiff was frightened by the nature of the message, as sehknew she had not agreed to any trade of illegal visiation for Fianncila Aid Forms, and she worried that somehow the defendan was going to implicate her in an illegal act, or at the very least, lose her all of the porotection afforde to her by the Civil Restraining Orders and Criminal Protiective Orders.

The child plaintiff, Rachel Egan, remained present in the living room as a witness, with the telephone set on speakerphone, and the taperecorder running, in case the recording failed.

the secretary answered the telephone and put the defendant, Attorney John Berman on the line.

The conversation began with Attorney b. stating that the financial aid forms were going to be at the post office in Centerbrook Ctonn. The next morning at 8:00 am after all, as if the confrontation in his law offices had never taken place.

The plaintiff had asked that the defenant drop off the docum at that particular post office as it was amall post office with only two workers who knew the def. P. egan personally and would hold something for him since his place of business was right around the corner from the post office, and she then would not have to worry about any violatin of her Civil Restraining

54

Orders or Criinal protective Orders as Cotnact would be avoide..

The defenant, knew that the pl who at that time still resided in Avon Ct, would have to drive the Financila Aid document down to Princeton New Jeresy that very day in order to not be disqualified from receiving financial aid.

Aftere the plaintiff and def discussed the details regarding the center brook cotnn post office drop for the documents, then the defendant brought up the visitaiton issue as if he and the plaintiff were now in agreement and had made the trade of the financial aid forms for the visitiation with the child plaintiff lo

The defen attempted to verify the trade by saying-

"And you'll hve Loyal there at Friendly's at eleven.  Right?".

The plaitniff then immediately reminded the def that she had just handed him the letter at his office and that he personally had signed for it and marked it received and had even written the date on it to verify he had received it.

The plaintiff reminded the defe. That she was refusing to break the protective orders, and the restriaing orders.

The defenant then told the plaintiff that thought she had agreed to the trade.

The plaint then told the defe. Again that there were Criminial Protective and Civil Restrainging Orders, and that he needed to get them modified in order to have a legal visitation.

The defe. Then "I thought you and I had an agreement that you were going to have Loyal there on Saturday.

The plaintiff again reminded the defendant that she had handed him the letter in the presense of his secretary and that the letter stated that Loyal was covered by the Criminal Protective Order and Civil Rstraining Ordres, and that all of the parties in volved would be

breaking those orders unless they were modified.

The plaintiff asked the defendant to please ge them modifiedso there wouldn't be aproblem.

The plaintiff did not want to tgive up her protection, to jeapordize the protection afforded boht her and her children, child plaintiffs, or to enable an eavenue for the deff. To commit any violent or abusive act against her.

The derf. Continued to complain that he could not ge the orders modified soon enough to enable a visitaiton for that coming weekend only tw days awy,.

The plaintiff reminded the defendant that she had stated to him in his law office and in the letter she had handed to him, that to allow the visitaition to take place would mean that the defenatn P egan would be breaking the Criuminal Family Violence Protective Order

The plaintiff finished that statement by then asking the defen. Attorney John Berman "Doesn't that bother you?"

The defe. Replied "No, not a bit.."

When the plaintiff asked the defendant why it didn't bother him, he stated that Judge Bishop in Family Court overuled the Criminal Court even though Judge Bishop never addressed the Civil Restraining Orders or the Criminal Family Protective Orders on January 6, 1999.

When the plaintiff asked the defendant if he wanted the child plaintiff, loyal to break the Civil Restraining Orders and Criminall Protective Orders, the defendant, said "Yes"

When the plaintiff akse the def

"don't you feel that that puts me in any poorer situation, that I';m breaking the very orders that aare set up to protect me?

The defendant answered "No, I don't."

The plaintiff expressed her concern that if something should happen to her and loy tha at judge would say that because she had voluntarily gone and agreed, she herself would have broken the orders and had no remedy.

The plaintiff went on to tell the def. That the orders were, as a matter of law, designed to protect Loyal from the defe. Paul Egan.

The defe. AB agrred with that statement by responing "Understand.".

When the plaintiff asked the defe if he had read the Civil Restraining and Criminal Family Violence Protective Orders, the defe.responded with

"I've looked them over yes."

When the plaintiff then said once again that the Orders were there to protect loyal from Paul also, the def. Responded with the answer "Right"

Then the plaintiff told the defe --

"If Paul does something and I've put lOyal in that jeopardy and violated the orers deliberately, then, once again, I have no recompmesne with I go to Court just like on December 22."

The defe.  Responsed -- "And I would agree with you on that."

After further discussion over the legality of violating all of the protective orders, the defendant, AB re-iterated

"But I thought we had an agreement that he was going to have visitiation this Saturday."

Te plaintiff again responded that she had never agreed to go ahead with the visitaiton and that she had writend him th efour-page letter stating just that, which he himself had

just read and personally signed for, which clearly stated that she had no intention of allowing illegal visitaiotn to take place.

The defe. Responded with the word "Right. And after that I thought you changed your mind.

The plaitniff then sked the def. Why she would change her mind, stating that it was a legal issue.

The defendant in resonsed stated "I understand that."

The plaintiff again told the defendant to plaeas get the orders appropriately modifies so that everyone was still protection and no violation would take place that could lose her and her children their protection.

The defeant, after agreeing to do that, told the plaintiff that she should atleast allow the telephone contact, evne though that was also strictly barred by all protective Orders.

The plaitniff and the defe continued to argue about the necessity of modifying the Civil and Criminal Protective Orders.

The plaintiff reminde the def. Of Judge Sheridan Mooress lecture on Decemer 22, 1998, only a few weeks earlier regarding the violation of protective orders and the unavailabity of a remedy if a victim voluntarily makes contact with the one she maintains the Orders against, and that therefore the Civil Restraining Orders and Criminal Protective Orders had to get modified to allow for contact.which would not negate their power to protect.

In response, the defenant told the plaintiff that she was wrong, and that the Civil Restraing Orders and Criminal Protective Orders did not need to be modified --

"im telling you that they don't have to be fixed, but --- and I am going to fix them."

58

The converstaiton then turned to the defena having filed for a Psyichiatric evaulation of the plaitniff because she wanted sole Cusotdy.

The defendant told the plaintif

"And also -- normal parents don't have to go for sole custody.  And I'm not saying you shouldn't do it.  But it's not -- it's not the way it's normally done.

When the pl responded

"so normal parents don't go for sole custody?"

The defe. Answered " Normally it's joint custody."

When the plaitniff responded

"So the fact that I want sole custody means that I';m unstable?"

The dee. Responded "no, it means that --- there is an issue in my mind.  I could be all wrong, but there's an issue here.

When the plaitniff asked "why"

The defenatnt responded "and maybe you'll be proven to be perfectly stable.

When the pl asked why it was an issue in his mind, Attorne Berman made the following statements

Because of the the way you act. You won't -- you wouldn't -- up until about a few daya go, you refused to talk, I spent the whole morning in corut. Id say can we talk and would say absolutely not.

When the plaintiff then went on to list all of the converssation that tey had engated in recently together, both in and out of the courthouse, the def said the following stat.

"the first time you tlake dto me was that ime whn Mageet Romanik came along. And we were talking about something that you were -- was in your interest, which was getting

that work done for Rachel.

When the plaintiff respondedn" you mena the financial aid?

The defe answered "that was the only time you'd ever been anywhere near civil or able to hold a civil ocnversation.

When the plaitniff questioned howe she was not civil the defe answered "YOu were just very uncivil. You ust refused to talk. YOU had --- would not engate in conversation.

When the plaintiff resoneded with Sot that means instability to you, the defendant, Attorney Bern stated "It tends to make me suspicious, yes, because that's again, not normal."

And that "Most people are very eager to tlka and want to tresolve problems. You don't have that --you're sort of opposed. I've got another call her, so I'm going to have to run."

When the plaintiff asked "What about --- so tomaroro morning I can pick up the forms?

The defendant responded "Well, I'm not -- I think I;ve covered the subject. But you're not helping yourself.

When the plaintiff followed with "YOu told me the forms would be --

The defendnta answered all right. I'm going to have to hand up now.

When the plaintiff asked agains whether the financial adif forms would be at the center brook post office as previously promised

The defendnat, said again"I'm going to have to hang up now. I' don't know."

When the plaintiff asked why the forms wouldn't be there, the defendant again said

"As I said, I have to hang up now. I don't know."

When the plaintiff then said "YOu just told me the forms would be there. Are they

60

not going to be there now?"

The def. Answered again "Aas I said, I don't know.

The plaintiff then asked again for an answer to the question, as the following day was the final deadline for the Fiancial Aid, and she needed to know

The defendant then denied that he had ever told her that the Finacial Aid Forms would be waiting for her at the Centerbrook Post office at 8:00 am the following morning

When the plaintiff then said

"You told me -- you todl me you wo7uld have him brin them there in the morning.  Correct.?"

The defenatn, said "No."

At that point the plaintiff, so upset at the days encounters with the defendant, and her anxiety that her daught, child plaintiff re would lose out on her opountity to attend the school of her choice for having missed the Fianncial Adi Application deadline, responded with words she had not expected herself to utter.

The plaintiff said "That's what you just said on the tape."

The defendant, Attorney Berman, then became aware that all that he had said an promised and implied during the telephone conversation was recorded.

The plaintiff then asked him one more time if the Financial Aid Forms would be where he had prvouly promised in the morning so that she could drive them to Princeton New Jersey.

"Mr. Berman, are the forms going to be there?

The defend responded :  I have to --- fine.

The following morning, the plaintiff drove to the Centerbrook Post Office, and the

61

Fianncial Aid Forms were there at just after 8:00 as previously promised.

Though the plaintiff had the forms, she knew that the only reason she had them in her possession ws that she had been forced into committing a crime in order to protect herself and her children's interests, and had received them as a by product of that crime.

The anxiety caused to the plaintiff and child plaintff RE by the events alleged regarding both telephone calls on January 8, 1999, and January 14, 1999, and the events in the conference room at the defendant's law fime, was purposefully caused by the defendant, Att. John

That anxiety and trauma was only increased further when the plaintiff discovered upon looking at the PFS, Parents Finacial Statement, that the defendant, Paul Egan, had deliberately disqualified his daugher, child plaintiff RE from recieveing any aid because he had fraudulently misrepresented his income on the forms.

The Parents Certification and Authorization, which the def. Signed, authorized the IRSto disclose his 4506 to the schools.  Portions of the defendant's income and actual salary figures were omitted completely or were false.

Any attempt to misrepresent income would cause a negation of any ability to receive Fianncial Aid.

The errors listed on the forms were gross errors, incapable of being honest errors, as they were so blatant as to obviously intentional.

The defendant, Attorney John Beramn and the defendant Payul Egan intentionally misrepresented the defendant pual Egan's income on the Fianncial documents that they submitted both prior during and afte the Divorce Trrial.

The defendant, Attrorney John Berman, and the defenantk, Paul Egan, over the

62

course of the following year afte the Divorce Trial fraudulently misreprsentated the income of the

defendant, Pual Egan to obtian an unjust and illegal modificanto of child Support.

The deffendant, Attorney John Berman interfered with the subpeano of a witness

in the divorce Trial.

The defendnat, Attorney Jhn Berman made judicial admission in open court that

he did not fill out the financial documents required according to state Guidelines, statues and

rules.

The defendan, Attorney Jhn Berman, further rmade false representations to the

Court on numerous occasion

The defendant, also participated in hearings that were violative of the plaintiffs

due process substantive and procedural rights.

The defendant, Attorney John Berman, committed blackmail in the lobby of the

Courthouse and threatened the plaintiff that if she refused to give up her Appeal, she would never

get her alimony back, implicating a judge who wuld help him against her.

The defendnat, Attorney John Berman intentionally aided the defendant Paul Egan

in cheating the child plaintiffs out of their legal entitlement ot Child Support.

The defendnat, Attorney Jonn berman brok a a sequestration Order during the

Divorce Trial.

The defendant, aided a judge in depriving the plaintiff of her due process

procedureal and substantive rights and illegally revoking her alimony.

As a direct and proximate result of the tortuous acts committed by the defendant, Attorney John

Berman on behalf of his client, the defendant, Paul Egan, against the plaintiff, Lisa Egan, the

plaintiff suffered the damage of extreme financial loss, and prolonged

financial crisis.

87.        As a direct and proximate result of the tortuous acts committed by the defendant, Attorney John Berman on behalf of his client, the defendant, Paul Egan, against the child plaintiffs, Rachel Egan, and Loyal Egan, the child plaintiffs suffered the damage of extreme financial loss, and prolonged financial crisis.

88..       As a direct and proximate result of the tortuous acts committed by the defendant, Paul Egan, against the plaintiff, Lisa Egan, the plaintiff suffered the damage of extreme financial loss, and prolonged financial crisis.

89..       As a direct and proximate result of the tortuous acts committed by the defendant, Paul Egan against the child plaintiffs, Rachel Egan and Loyal Egan, the child plaintiffs suffered the damage of extreme financial loss, and prolonged financial crisis..

90.        As a direct and proximate result of the tortuous acts committed by the defendant, Attorney John Berman on behalf of his client, the defendant, Paul Egan, against the plaintiff, Lisa Egan, the plaintiff was denied access to the appropriate Child Support entitled to be used by her for the benefit of the children's care and welfare under State Law.

82.        As a direct and proximate result of the tortuous acts committed by the defendant, Attorney John Berman on behalf of his client, the defendant, Paul Egan, against the plaintiff, Lisa Egan, the plaintiff was denied access to the appropriate Child Support entitled to be used by her for the benefit of her children's care and welfare under Federal Law.

83.        As a direct and proximate result of the tortuous acts committed by the defendant, Attorney John Berman on behalf of his client, the defendant, Paul Egan, against the child plaintiffs, Rachel Egan and Loyal Egan,  the child plaintiffs were denied the benefit of the appropriate Child Support entitled to them under State Law.

64

84.     As a direct and proximate result of the tortuous acts committed by the defendant, Attorney John Berman on behalf of his client, the defendant, Paul Egan, against the child plaintiffs, Rachel Egan and Loyal Egan,  the child plaintiffs were denied the benefit of the appropriate Child Support entitled to them under Federal Law.

85.     As a direct and proximate result of the tortuous acts committed by the defendant, Paul Egan, against the plaintiff, Lisa Egan, the plaintiff was denied access to the appropriate Child Support entitled to be used by her for the benefit of the children's care and welfare under State Law.

86.     As a direct and proximate result of the tortuous acts committed by the defendant, Paul Egan, against the plaintiff, Lisa Egan, the plaintiff was denied access to the appropriate Child Support entitled to be used by her for the benefit of the children's care and welfare under Federal Law.

87.     As a direct and proximate result of the tortuous acts committed by the defendant, Paul Egan, against the child plaintiffs, Rachel Egan and Loyal Egan, the child plaintiffs was denied the benefit of the appropriate Child Support entitled to them under State Law.

88.     As a direct and proximate result of the tortuous acts committed by the defendant, Paul Egan, against the child plaintiffs, Rachel Egan and Loyal Egan, the child plaintiffs was denied the benefit of the appropriate Child Support entitled to them under Federal Law.

89.     As a direct and proximate result of the tortuous acts committed by the defendant, Attorney John Berman on behalf of his client, the defendant, Paul Egan, against the plaintiff, Lisa Egan, the plaintiff suffered the damage of prolonged severe emotional anxiety,

fear, and distress.

90.        As a direct and proximate result of the tortuious acts committed by the defendant, Attorney John Berman on behalf of his client, the defendant, Paul Egan, against the child plaintiffs, Rachel Egan and Loyal Egan, the child plaintiffs suffered the damage of prolonged severe emotional anxiety, fear, and distress.

91.        As a direct and proximate result of the tortuious acts committed by the defendant, Paul Egan, against the plaintiff, Lisa Egan, the plaintiff suffered the damage of prolonged severe emotional anxiety, fear, and distress.

92.        As a direct and proximate result of the tortuious acts committed by the defendant, Paul Egan, against the child plaintiffs, Rachel Egan and Loyal Egan, the child plaintiffs suffered the damage of prolonged severe emotional anxiety, fear, and distress.

As a direct and proximate result of the tortuous acts committed by the defendant, Attorney John Berman, on behalf of his client, the defendant, Paul Egan, against the plaintiff, Lisa Egan, the plaintiff was denied her right to enjoy the protection of Civil Restraining Orders, and Criminal Protective Orders granted her by the State of Connecticut, without hindrance or harassment.

As a direct and proximate result of the tortuous acts committed by the defendant, Attorney John Berman, on behalf of his client, the defendant, Paul Egan, against the plaintiff, Lisa Egan, the plaintiff was denied her right to enjoy the protection of her Civil Restraining Orders and Criminal Protective Orders, in furtherance of the free exercise of her First an Fourteenth Amendment Rights guaranteed her under State and Federal Constitutions, without hindrance or harassment. .

66

As a direct and proximate result of the tortuous acts committed by the defendant, Attorney John Berman, on behalf of his client, the defendant, Paul Egan, against the child plaintiffs, Rachel Egan and Loyal Egan, the child plaintiffs were denied their right to enjoy the protection of Civil Restraining Orders, and Criminal Protective Orders, granted to them by the State of Connecticut, without hindrance or harassment.

As a direct and proximate result of the tortuous acts committed by the defendant, Attorney John Berman, on behalf of his client, the defendant, Paul Egan, against the child plaintiffs, Rachel Egan and Loyal Egan, the child plaintiffs was denied their right to enjoy the protection of their Civil Restraining Orders and Criminal Protective Orders, in furtherance of their free exercise of their First an Fourteenth Amendment Rights guaranteed her under State and Federal Constitutions, without hindrance or harassment. .

As a direct and proximate result of the tortuous acts committed by the defendant, Paul Egan, with the aid of his attorney, the defendant, Attorney John Berman, against the plaintiff, Lisa Egan, the plaintiff was denied her right to enjoy the protection of Civil Restraining Orders and Criminal Protective Orders granted her by the State of Connecticut, without hindrance or harassment. .

As a direct and proximate result of the tortuous acts committed  by the defendant, Paul Egan, with the aid of his attorney, the defendant, Attorney John Berman, against the plaintiff, Lisa Egan, the plaintiff was denied her right to enjoy the protection of Civil Restraining Orders and Criminal Protective Orders in furtherance of her free exercise of her First and Fourteenth Amendment Rights guaranteed under State and Federal Constitutions, without hindrance, or harassment.

As a direct and proximate result of the tortuous acts committed by the defendant, Paul Egan, with the aid of his attorney, the defendant, Attorney John Berman, against the child plaintiffs, Rachel Egan and Loyal Egan, the child plaintiffs were denied their right to enjoy the protection of Civil Restraining Orders and Criminal Protective Orders granted them by the State of Connecticut, without hindrance or harassment.

As a direct and proximate result of the tortuous acts committed by the defendant, Paul Egan, with the aid of his attorney, the defendant, Attorney John Berman, against the child plaintiffs, Rachel Egan and Loyal Egan, the child plaintiffs was denied their right to enjoy the protection of their Civil Restraining Orders and Criminal Protective Orders in furtherance of their free exercise of their First and Fourteenth Amendment Rights guaranteed under State and Federal Constitutions, without hindrance or harassment.


As a direct and proximate result of the tortuious acts committed by the defendant, Attorney John Berman, on behalf of his client, the defendant, Paul Egan, against the plaintiff, Lisa Egan, the plaintiff was denied her opportunity to fully exercise and enjoy her Due Process Rights in the context of judicial proceedings, which resulted in the plaintiff, Lisa Egan suffering the damage of extreme financial loss and prolonged financial crisis.

As a direct and proximate result of the tortuious acts committed by the defendant, Attorney John Berman, on behalf of his client, the defendant, Paul Egan, the plaintiff, Lisa Egan, was denied her opportunity to fully exercise and enjoy her Due Process Rights in the context of judicial proceedings, which resulted in the child plaintiffs, Rachel Egan and Loyal Egan, suffering the damage of extreme financial loss and prolonged financial crisis.

As a direct and proximate result of the tortuious acts committed by the defendant,

68

Attorney John Berman, on behalf of his client, the defendant, Paul Egan, the plaintiff, Lisa Egan, was denied her opportunity to fully exercise and enjoy her Due Process Rights in the context of judicial proceedings, which resulted in the plaintiff, Lisa Egan, suffering the damage of extreme severe emotional distress, anxiety, and fear.

As a direct and proximate result of the tortuious acts committed by the defendant, Attorney John Berman, on behalf of his client, the defendant, Paul Egan, the plaintiff, Lisa Egan, was denied her opportunity to fully exercise and enjoy her Due Process Rights in the context of judicial proceedings, which resulted in the child plaintiffs, Rachel Egan and Loyal Egan, suffering the damage of extreme severe emotional distress, anxiety, and fear.

As a direct and proximate result of the tortuious acts committed by the defendant, Paul Egan, with the aid of his attorney, the defendant, Attorney John Berman, against the plaintiff, Lisa Egan, the plaintiff was denied her opportunity to fully exercise and enjoy her Due Process Rights in the context of judicial proceedins, which resulted in the plaintiff, Lisa Egan, suffering extreme financial loss and prolonged financial crisis.

As a direct and proximate result of the tortious acts committed by the defendant, Paul Egan, with the aid of his attorney, the defendant, Attorney John Berman, against the plaintiff, Lisa Egan, the plaintiff was denied her opportunity to fully exercise and enjoy her Due Process Rights in the context of judicial proceedings, which resulted in the plaintiff, Lisa Egan, suffering severe emotional distress, anxiety, and fear. .

As direct and proximate result of the tortuous actions committed by the defendant, Paul Egan,  with the aid of his attorney, the defendant, Attorney John Berman, against the plaintiff, Lisa Egan, the plaintiff was denied her opportunity to fully exercise and enjoy her Due Process Rights in the context of judicial proceedings, which resulted in the child plaintiffs,

Rachel Egan and Loyal Egan, suffering further extreme financial loss, and severe emotional distress, anxiety, and fear.

.            Wherefore the plaintiff request that the Court find the defendnat, jointly and severally liable for in punative damages,as well as compensatory, special, and all other damages afforded to them.

Respectfully Submitted,

Rachel Egan
Rachel Egan

Hadley Macpherson
Hadley Macpherson
P.O. Box 501
Laheska, PA 18931
(215) 325-1001

Loyal Egan
Loyal Egan

70

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been mailed this

day, March 14, 2004, to Attorney Jim Wade, of Robinson & Cole, at 280 Trumbull

Street, Hartford, CT  06103 - 3597, and Paul Egan, at P.O. Box 83,Centerbrook, CT.

06409.


_Rachel Egan_

Rachel Egan

_Loyal Egan_

Loyal Egan

Plaintiff Pro Se

_Hadley Macpherson_

Hadley Macpherson

P.O. Box 501

Lahaska, PA   18931

(215) 230 - 8998